**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Western Surety Company, | No. CV-16-00761-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

*Background*

In October 2018, the Court was made aware of a discovery dispute between Plaintiff Western Surety Company ("Western") and Intervenor Defendant Employers Mutual Casualty Company ("EMC"). This dispute arose in connection with EMC's discovery requests seeking reserve amounts set by Western relating to Select Development & Construction, Inc. ("Select"). Western objected to those requests claiming they were burdensome and sought information that was confidential and privileged. Oral argument was held on November 7, 2018 to discuss those issues. After oral argument, Western's counsel informed the Court that Western's attorney, Doug Mraz ("Mr. Mraz"), was solely responsible for setting the reserve amounts relating to Select and filed a memorandum on November 21, 2018 alleging that the information is protected by the attorney-client privilege and work-product doctrine. (Doc. 81). EMC filed a response memorandum on November 30, 2018, opposing Western's claims of privilege and confidentiality. (Doc. 82).
…

*Factual Background*

In February 2012, Select entered into a contract with the County of Pima, Arizona, in connection with a road construction project ("La Canada Project"). Western provided Select with performance and payment bonds totaling $18,750,777.34 for this project naming Pima County as the obligee. In June and October 2013, Select entered into two contracts with Pima County in connection with two construction projects ("Magee Road Project" and "Homer Davis Project"). EMC provided Select with performance and payment bonds for these projects in the amount of $10,969,001.40 naming Pima County as the obligee.

Select failed to comply with its contractual obligations for the La Canada, Magee Road, and Homer Davis Projects leaving Western and EMC with substantial losses in excess of $1.3 million. In April 2017, Pima County entered into a Settlement Agreement with Western in connection with unpaid funds arising out of the La Canada Project in the amount of $1.3 million. Subsequently, Pima County became aware that multiple parties, including EMC, were exercising their rights to that $1.3 million settlement amount and Pima County filed a motion to interplead those funds. (Doc. 32). The motion was granted and that $1.3 million is currently in dispute between Western and EMC. (Doc. 46).

In connection with EMC's claim to the interpleaded funds, EMC alleges that Western's financial loss for the La Canada Project was due to Western's reimbursement of Select's payroll expenses. EMC claims that those reimbursement expenditures are not a performance bond loss since Western was under no contractual obligation to assist Select with continuing their business operations. In connection with this argument, EMC states that it requires the reserve amounts set by Western to determine if Western suffered the financial losses it claims.

…

…

…

…

*Analysis*

Federal Rule of Civil Procedure 26(b) establishes the relevant scope of discovery and provides, in pertinent part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The Court has broad discretion to determine whether to compel disclosure of discovery. *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002).

EMC propounded the following contested discovery requests upon Western:

- **Request for Production:** Please produce any documents that support your responses to the Requests for Admission and Non-Uniform Interrogatories set forth above, including but not limited to any documents relating to reserves set by Western Surety relating to Select Development & Construction, Inc.
- **Interrogatory:** If Western Surety set reserves for a Performance Bond claim on the La Canada Project, please state the date any such reserves were set and the corresponding amount of money for the reserves.

Western objected to these requests claiming "that information pertaining to reserves set in this matter is irrelevant, privileged, confidential, and proprietary, as it involves Western Surety's unique evaluation processes which is also protected as a trade secret." (Doc. 82-1, pg. 3). The Court will examine EMC's discovery requests pursuant to Western's objections based on: (1) relevancy; and (2) privilege.

1. *Relevancy*

Surety companies ordinarily set reserve amounts in advance with a sum sufficient

to pay possible claims. Western alleges that the amount in reserves set for Select are irrelevant since it has provided sufficient documents proving the losses it has incurred by producing canceled checks indicating the losses Western claims it has suffered. However, EMC claims that most of Western's alleged losses were losses unconnected to Western's underlying performance bond with Select.

While case law discussing the discoverability of reserve information exists, that case law is limited to the context of insurance bad faith and courts are not in agreement on the issue. *See Spahr v. Amco Ins. Co.*, No. CV 09-9174-PA (AGRX), 2010 WL 11459909, at *2 (C.D. Cal. Sept. 29, 2010) ("Whether evidence of loss reserves is discoverable depends upon the issues presented in a given case. In general, loss reserves are not discoverable.") (internal citations and quotations omitted); *Miller v. York Risk Servs. Grp.*, No. CV-13-01419-PHX-JWS, 2014 WL 11515634, at *5 (D. Ariz. June 20, 2014) ("The federal District Courts have generally held that an insurance company's reserve information and aggregate claims information is relevant and discoverable in cases alleging bad faith."); *RKF Retail Holdings, LLC v. Tropicana Las Vegas, Inc.*, No. 214CV01232APGGWF, 2017 WL 2292818, at *8 (D. Nev. May 25, 2017) ("Reserve information is relevant in an insurance bad faith lawsuit because the insurer has the contractual duty to defend and indemnify its insured, which also encompasses the duty to reasonably evaluate and settle claims within the policy's coverage.").

In insurance bad faith cases, policyholders often seek information pertaining to loss reserves to show "what [the insurer] actually knew and thought, and what motives animated its conduct, which are critical areas of inquiry in bad faith cases and fully fair game for discovery." *Paul Johnson Drywall, Inc. v. Phoenix Ins. Co.*, No. CIV. 13-8124-PCT-PGR, 2014 WL 1764126, at *3 (D. Ariz. May 5, 2014) (citing *Bernstein v. The Travelers Insurance Company*, 447 F.Supp.2d 1100, 1107 (N.D. Cal. 2006)); *see also Flintkote Co. v. Gen. Acc. Assur. Co. of Canada*, No. C 04-01827 MHP, 2009 WL 1457974, at *4 (N.D. Cal. May 26, 2009) ("Since reserves are set for claims that the insurer might be liable to pay, the reserves may indicate an estimate of the amount that defendant believed or knew

it would have to pay for plaintiff's asbestos-related claims. This information may be relevant to showing the difference between what defendant thought it would have to pay and its communications with plaintiff regarding its evaluation of the scope of the loss.").

As is evident, the established case law pertaining to the discoverability of loss reserves in the insurance bad faith context is not applicable here. EMC is not seeking reserve information to highlight a disconnect between Western's payment of benefits and its evaluation of the scope of loss for the La Canada Project. EMC is seeking reserve information because it alleges Western did not suffer the losses it claims that it suffered. Surety companies pay claims through funds set aside in a claims reserve and Western's reserve amount certainly bears upon the loss amounts it allegedly suffered. Since "[r]elevance is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that bears on, any issue that is or may be in the case", *Paul Johnson Drywall*, 2014 WL 1764126, at *1, the Court finds that the reserve amounts set by Western are relevant. Whether that information is privileged is a separate inquiry.

 2. *Privilege*

Western asserts that its reserve information is privileged because it was set solely by Mr. Mraz, in his capacity as legal counsel, and, therefore, the information is protected by the: (1) attorney-client privilege; and (2) work-product doctrine. (Doc. 81, pg. 2). It is well recognized "that the burden to establish the applicability of any privilege is on the proponent, and that burden begins with providing an adequate identification of the reasons why the privilege is warranted with respect to each and every communication and each and every document claimed to be protected." *S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 550 (D. Ariz. 2002).

 A. *Attorney-Client Privilege*

"The Ninth Circuit has set forth the following 'essential elements' for invocation of the attorney-client privilege: (1) legal advice is sought; (2) from a professional legal adviser in his or her capacity as such; (3) the communication relates to that purpose; (4) is made in confidence; and (5) by the client." *S. Union Co.*, 205 F.R.D. at 546 (citing *Admiral Ins. Co.*

*v. U.S. Dist. Ct. D. Ariz.*, 881 F.2d 1486, 1492 (9th Cir. 1989)). The privilege is meant to protect confidential communications between an attorney and a client securing legal advice from the attorney. *U.S. v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).

The threshold question here is whether or not the setting of a surety reserve is "legal advice." "In order to show that a communication relates to legal advice, the proponent of the privilege must demonstrate that the 'primary purpose' of the communication was securing legal advice." *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) (citing *United States v. Chevron Corp.*, No. C-94-1885 SBA, 1996 WL 264769, at *3 (N.D. Cal. Mar. 13, 1996), amended, No. C 94-1885 SBA, 1996 WL 444597 (N.D. Cal. May 30, 1996).).

Western claims that its reserve information is subject to the attorney-client privilege "because its Senior Claims Counsel, Doug Mraz, in his capacity as legal counsel, solely set the reserves pertaining to the bonds issued to Select Development . . . In setting the reserves and in making subsequent adjustments to the reserves, Mr. Mraz handled all aspects including the dates the reserves were set or adjusted, the amounts of the reserves, and all other information pertaining to the reserves which reflected his understanding of and mental impressions regarding the status of the Select Development matter." (Doc. 81, pg. 2-3). This is not a sufficient reason to invoke the attorney-client privilege. "The purpose behind the attorney-client privilege is to promote complete and candid communications between attorneys and their clients in order to allow attorneys the ability to render informed and sound legal advice. The privilege is to be strictly construed." *Resolution Tr. Corp. v. Dean*, 813 F. Supp. 1426, 1428 (D. Ariz. 1993) (citations omitted).

Western has provided no evidence that the setting of its reserves by an attorney constitutes legal advice. If the attorney-client privilege attached each time legal counsel became involved in a matter, the privilege would be impermissibly magnified and would permit corporations to offensively wield the privilege and successfully object to any discovery request involving their attorneys. It is well established that "in-house attorneys can serve multiple functions within [a] corporation. In-house counsel may be involved

intimately in the corporation's day to day business activities and frequently serve as integral players in business decisions or activities. Accordingly, communications involving in-house counsel might well pertain to business rather than legal matters. The privilege does not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys." *ChevronTexaco Corp.*, 241 F. Supp. 2d at 1076. Western has not demonstrated that its reserve information is anything but "business advice." Since only "legal advice" is protected by the attorney-client privilege, the Court finds that Western has not met its burden.

### B. Work-Product Doctrine

Ordinarily, for documents to qualify for protection under the work-product doctrine: "(1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004) (internal citations and quotations omitted). In support of its claim that reserve information is protected by the work-product doctrine, Western writes:

> It should be noted that the case at bar is far from the first piece of litigation in which Western Surety has been involved as a result of its issuance of the Bonds to Select Development; Western Surety has been a named defendant in various cases related to Select Development dating back to 2013, the date Mr. Mraz first set reserves, and was certainly aware of the possibility of litigation before the first complaint was filed. In setting the reserves and in making subsequent adjustments to the reserves, Mr. Mraz handled all aspects including the dates the reserves were set or adjusted, the amounts of the reserves, and all other information pertaining to the reserves which reflected his understanding of and mental impressions regarding the status of the Select Development matter.

(Doc. 81, pg. 2-3).

Western suggests that when Mr. Mraz first set the reserves in this case, he was "aware of the possibility of litigation before the first complaint was filed." What is material is not whether Mr. Mraz was "aware of the possibility of litigation" but whether Mr. Mraz prepared and set reserve amounts in anticipation of litigation or for trial. Surety companies

set reserve amounts as a course of business. Western has not provided any evidence indicating that Mr. Mraz specifically prepared these surety reserve amounts in anticipation of litigation or for trial. The mere fact that in-house-counsel was aware of the possibility of litigation is not sufficient to apply the work-product doctrine. "One of the primary purposes of the work product doctrine is to prevent one party from exploiting another party's efforts to prepare for litigation." *RKF Retail Holdings, LLC*, 2017 WL 2292818, at *5. It is highly likely that every corporate representative is aware that any business transaction can result in litigation.

Here, Mr. Mraz established reserve amounts in the ordinary course of the surety business and "[d]ocuments prepared in the ordinary course of business are not protected by the work product doctrine because they would have been created regardless of the litigation." *City of Glendale v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. CV-12-380-PHX-BSB, 2013 WL 1797308, at *12 (D. Ariz. Apr. 29, 2013). Western provides no evidence that this information was prepared specifically in anticipation of litigation or for trial and, therefore, the work-product doctrine does not apply.

*Conclusion*

Western's reserve information is relevant and not protected by either the attorney-client privilege or the work-product doctrine. However, while the raw reserve numbers requested in EMC's Interrogatory are discoverable, EMC's Request for Production is impermissibly broad and encompasses documents and communications between Mr. Mraz and Western that will very likely be protected by the attorney-client privilege or work-product doctrine.

The cases cited by EMC in their November 30, 2018 memorandum are instructive as they only provide that reserve amounts and dates are discoverable. *See Loyal Order of Moose, Lodge 1392 v. Int'l Fid. Ins. Co.*, 797 P.2d 622, 628 n. 14 (Alaska 1990) ("The **existence** and **amount** of any loss reserve is not a protected confidential communication made for the purpose of facilitating the rendition of professional legal services.") (emphasis added); *State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone*, 648 S.E.2d 31, 43 (W. Va.

2007) ("We simply have no basis to find either that the lower court erred as a matter of law or abused its discretion by concluding that the **reserve amounts** and the **dates** the amounts were set are subject to discovery in this case.") (emphasis added). EMC even distinguishes a case cited by Western as inapposite because it "involved settlement reserve documents, not amounts/dates of general claim reserves, with documents that 'contain legal advice provided . . . by counsel.'" (Doc. 82, pg. 6).

Furthermore, Western's reserve amounts are likely proprietary and Western's fear that it would be providing confidential information to a competitor is legitimate. To mitigate Western's concerns, the Court will order that the parties draft and file a protective order designating any information provided in connection with Western's reserves to be for attorney's eyes only.

IT IS HEREBY ORDERED:

1. Plaintiff Western Surety Company must respond to Intervenor Defendant Employers Mutual Casualty Company's Interrogatory seeking reserve amounts.
2. Plaintiff Western Surety Company need not respond to Intervenor Defendant Employers Mutual Casualty Company's Request for Production seeking documents relating to reserve amounts.
3. The parties are directed to file a stipulated protective order that any information pertaining to reserve amounts provided by Plaintiff Western Surety Company shall be designated "attorney's eyes only."

Dated this 21st day of December, 2018.

_____
Honorable Cindy K. Jorgenson
United States District Judge